NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240756-U

NO. 4-24-0756

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 4, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|      Petitioner-Appellee, | ) | No. 21JA77 |
|      v. | ) | |
| Alexandra B., | ) | Honorable |
|      Respondent-Appellant). | ) | Christopher G. Perrin, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

*Held:* The appellate court affirmed the trial court's termination of respondent's
parental rights because the court's fitness and best-interest findings were
not against the manifest weight of the evidence.

¶ 1 Respondent, Alexandra B., is the mother of G.B. (born April 2021). (We note that

the father of G.B. is not a party to this appeal.) In February 2024, the trial court found respondent

was an unfit parent, and in June 2024, it found termination of respondent's parental rights would

be in the minor's best interest. Respondent appeals, arguing that the court's (1) fitness and

(2) best-interest determinations were against the manifest weight of the evidence. We disagree

and affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                  A. Procedural History

¶ 4 In May 2021, the State filed a petition for adjudication of wardship, alleging G.B.

was neglected in that (1) he was not receiving the proper care for his well-being due to his mother's failure to "make a proper care plan" and "cooperate fully with intact services" (705 ILCS 405/2-3(1)(a) (West 2020)) and (2) his environment was injurious to his welfare due to his mother's mental illness (*id.* § 2-3(1)(b)). That same month, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of G.B. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 5    In January 2022, the trial court adjudicated G.B. a neglected minor as alleged in the petition.

¶ 6    In February 2022, the trial court conducted a dispositional hearing, at the conclusion of which it entered a written order finding (1) respondent "unfit, unable or unwilling" for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline G.B. and (2) facts at adjudication established the need for life skills, mental health counseling, stable housing, and cooperation with services. The court also (1) adjudicated G.B. a ward of the court, (2) placed guardianship and custody of G.B. with the guardianship administrator of DCFS, and (3) admonished respondent that she "must cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that required G.B. to be in care, or risk termination of her parental rights."

¶ 7                              B. The Termination Hearing

¶ 8    In August 2023, the State filed a supplemental motion for termination of parental rights, alleging that respondent was an unfit parent because she (1) abandoned G.B (750 ILCS 50/1(D)(a) (West 2022)); (2) failed to maintain a reasonable degree of interest, concern, or responsibility as to G.B.'s welfare (*id.* § 1(D)(b)); (3) deserted G.B. for more than three months preceding the commencement of the termination proceedings (*id.* § 1(D)(c)); (4) failed to make

- 2 -

reasonable efforts to correct the conditions that were the basis for the removal of G.B. from respondent within the nine-month periods of January 13, 2022, to October 13, 2022, and October 13, 2022, to July 13, 2023 (*id.* § 1(D)(m)(i)); (5) failed to make reasonable progress toward the return of G.B. to respondent during the same nine-month periods (*id.* § 1(D)(m)(ii)); and (6) demonstrated an inability to discharge parental responsibilities, as supported by competent evidence from a clinical psychologist of mental impairment, and there existed sufficient justification to believe that the inability would exceed a reasonable period of time (*id.* § 1(D)(p)).

¶ 9                                  1. *The Fitness Proceedings*

¶ 10          On separate dates in January and February 2024, the trial court conducted the fitness portion of the termination proceedings. At the State's request, the court took judicial notice of the adjudicatory and dispositional orders. Also at the State's request, the court admitted into evidence seven service plans, dated April 2021 through November 2023.

¶ 11                                  a. Dr. Judy Osgood

¶ 12          The State called Dr. Judy Osgood, a licensed clinical psychologist, who conducted a psychological evaluation of respondent at the request of DCFS in May 2022. Prior to interviewing respondent, Osgood received background information on respondent's case from DCFS, including the July 2021 service plan.

¶ 13          Osgood testified that during her interview of respondent, Osgood addressed respondent's childhood history, personal history, psychological functioning, education, employment, and DCFS involvement. Osgood also administered (1) an IQ test and (2) four separate psychological tests. Based on the testing, Osgood determined respondent's "full scale IQ" to be 70, which was "consistent with an intellectual disability." Osgood further testified that, as part of her evaluation, she had the caseworker complete an "adaptive assessment," which is a

standardized assessment that (1) is completed by someone who knows the test subject and (2) provides a comprehensive assessment of the subject's day-to-day functioning. The assessment measured respondent's "depth of functioning [as] extremely low in all major areas."

¶ 14　　Osgood testified that respondent had "significant deficits in both her intellectual and adaptive functioning" and that "she met the criteria for intellectual disability." Osgood believed that respondent "was not able to benefit from or learn adaptive services given her [cognitive] weaknesses." Osgood diagnosed respondent with (1) "intellectual disability," (2) "depressive disorder," (3) "personal risk factors" (which Osgood explained included intellectual disability, lifestyle, lack of independence, and impaired judgment), and (4) "parent/child relational problems." As an example of impaired judgment, Osgood described one occasion when respondent was sick with COVID-19 but nonetheless visited five-month-old G.B., causing G.B. to contract COVID-19 as well.

¶ 15　　When asked whether respondent would ever be able to overcome her limitations and parent G.B., Osgood answered, "no," and explained as follows:

　　　　"Based upon the extensive treatment and services she was provided and the assistance and even dependency on others, she wasn't able to overcome those risk limitations. She wasn't able to really make progress, never demonstrated an ability to safely care for her son and never seemed to understand how to do that."

¶ 16　　Osgood further opined that respondent (1) was "unable to discharge minimal parenting standards" and (2) "would not benefit from additional services." Osgood explained her conclusion that respondent would not benefit from additional services as follows:

　　　　"I didn't recommend a parent capacity assessment for all the reasons I explained about her risk factors, her intellectual disability, and the fact that at the time I did

- 4 -

the evaluation she wasn't even meeting with her son; that she wasn't visiting him, and that she just didn't even understand some basic parenting skills such as not visiting her son when she was sick and getting—contracting [COVID-19]; and just her dependency on others. It was my conclusion she was unable to really develop or meet those minimal parenting skills."

¶ 17                                      b. McKenzie Vorreyer

¶ 18        The State called McKenzie Vorreyer, who testified that she was employed by DCFS and was respondent's caseworker from June 2021 to May 2023. Vorreyer testified that she authored six of the seven service plans that had been admitted into evidence. Each of those six service plans were "rated unsatisfactory." She explained that a service plan is reviewed approximately every six months at an administrative case review.

¶ 19        Vorreyer testified that respondent was required to complete the following services: (1) parenting skills, (2) habilitation services (to obtain housing and employment), (3) substance abuse (including drug tests), and (4) mental health counseling. Vorreyer reviewed with respondent what services were required of her "many, many times" through text messages and at "child and family team meetings."

¶ 20        Respondent did not successfully complete any of the required services. Although she attended all of her parenting classes, respondent did not pass the parenting test that was administered at the end of the course. Vorreyer did not make a second referral to repeat the classes because "there was no need for her to even do parenting [classes] because she didn't comprehend the material."

¶ 21        Respondent received parenting coaching along with the parenting classes; however, respondent was "dropped from parenting coaching." The parenting coach reported to

Vorreyer that respondent couldn't make a bottle, was not bonding with the child, and did not understand milestones, such as when G.B. should be talking or reading. Respondent attempted to change a diaper and put G.B.'s clothes back on without a new diaper. The parenting coaching was discontinued around November 2021.

¶ 22 Vorreyer testified that respondent "was suppose[d] to be doing [mental health counseling] through Memorial Mental Health." Although respondent completed an evaluation, she "never followed up with it." Vorreyer testified that, "at one point, [respondent] told me she was doing [mental health counseling] through SIU [Medicine]," but Vorreyer learned they had "no report of her showing up or being there."

¶ 23 Respondent was not required to do substance abuse counseling, but she was required to complete random drug tests. Vorreyer testified that respondent did not appear for most of her drug tests, although DCFS provided her transportation assistance. When she did appear for testing, she tested negative.

¶ 24 Regarding habilitation services, workers came to respondent's home and found it to be "extremely filthy" and infested with bed bugs. Due to the condition of the house, respondent was supposed to meet with the habilitation worker at a new location. Vorreyer testified, "That never happened and so services were dropped."

¶ 25 Regarding visitation with G.B., Vorreyer testified that in the beginning of the case, respondent was offered visits twice a week for two hours. Later, when the permanency goal was changed to substitute care (in approximately March 2023), visitation frequency changed to one hour once a month. However, Vorreyer testified that, "[for] the entirety of the case, I think she attended possibly 10 visits." Vorreyer stated that "a lot of times," respondent missed visits because she slept through them. Vorreyer also testified that the agency even sent transportation

to respondent's house to pick her up and "she wouldn't come to the door numerous different times."

¶ 26 Vorreyer stated that the agency provided transportation not just for visits, but for all services. She said that initially, transportation was provided through a company called "Addus," but "[t]hey would no longer transport her because of her actions, the way she acted." Then, she was given bus passes, but she refused to take the bus because "she said that she got anxiety on the bus."

¶ 27 During Vorreyer's time on the case, respondent was employed for only one week at a gambling facility before she was fired. Respondent had no independent income, relying solely on her mother.

¶ 28 The State asked Vorreyer about her communication with respondent. Vorreyer stated, "She was normally always very argumentative and had a very hard time understanding what she needed to do even though it was continuously stated to her over and over again that was always a big—that was a major problem when we would discuss her not understanding." Vorreyer also testified that respondent would never allow Vorreyer to enter her home. Vorreyer stated that she explained to respondent that it was a necessary part of her job to visit respondent at home so she could see if the home was an appropriate place for G.B. to return to live. In response, respondent told Vorreyer she would need a court order.

¶ 29 Vorreyer decided to make the referral for a psychological evaluation in approximately April 2022. Respondent initially refused to do it, then the appointment was cancelled "a couple of times," which delayed the process, but respondent eventually attended an appointment with Dr. Osgood. Vorreyer provided Osgood with the service plans and told her that her biggest concern was respondent "not comprehending the information when she was given

that information." Vorreyer explained that the purpose of the evaluation was for Osgood to assess whether respondent could actually parent G.B. Osgood performed the evaluation and opined that respondent would not be able to parent G.B. and could not live on her own, instead needing to rely on others.

¶ 30        The State asked Vorreyer if there was ever a time that she was close to returning G.B. back to respondent, and Vorreyer answered, "No." When asked why not, Vorreyer answered that respondent was not doing the services that were required of her and had not corrected the conditions that led G.B. to be taken from her care.

¶ 31                            c. Jenny Metzroth

¶ 32        The State called Jenny Metzroth, who testified that she was employed by DCFS and was the caseworker on respondent's case for a three-month period while Vorreyer was on maternity leave, from approximately October 2021 to January 2022. During that time, Metzroth continued to implement the service plan that was in place, without adding or removing any required services.

¶ 33        Metzroth testified that respondent attended visits with G.B. four times in the 13 weeks that Metzroth was on the case. Metzroth observed each of the four visits and, when asked what she observed of respondent's parenting skills during those visits, answered, "I don't believe I saw her feeding or changing him during a visit." During Metzroth's time as the caseworker, respondent had not completed any services. Metzroth testified that there was no time during that period that she was close to returning G.B. to respondent's care and Metzroth herself, in November 2021, rated the July 2021 service plan "unsatisfactory."

¶ 34        Metzroth also testified that she asked respondent to complete three drug tests. Respondent attended one test in December 2021, which was negative for drugs, but she failed to

appear for the other two.

¶ 35    Metzroth testified that respondent was supposed to be attending mental health counseling at Memorial Behavioral Health. She talked to respondent's counselor in December 2021, who reported that respondent was sporadically attending some appointments but was not making any progress. Metzroth testified that, according to the counselor, respondent "was more focused on DCFS's fault in all of the situation she was in and not in actually dealing with her own anxiety and [posttraumatic stress disorder] and mental health struggles."

¶ 36    Metzroth testified that, prior to her involvement, respondent had been referred twice to The Parent Place for parenting classes and was discharged for missing too many classes. Metzroth referred her a third time, and respondent was discharged again. The Parent Place advised Metzroth that respondent could not be rereferred until July 2022 due to three unsatisfactory discharges in a short period of time.

¶ 37    When asked to describe respondent's level of cooperation, Metzroth answered that, although respondent communicated with her, she did not follow through with Metzroth's recommendations. For instance, Metzroth told respondent that the drug tests were part of the service plan and expected by the trial court, but respondent answered that her boyfriend told her that she did not have to do a drug screen without a court order. When Metzroth told respondent that she needed to enter her home to do "home visits," respondent answered that "her boyfriend told her and the internet told her that [Metzroth] couldn't come in without a warrant." Metzroth said she had such conversations with respondent "numerous times."

¶ 38    Metzroth testified that she believed respondent understood what she needed to do to complete her services but chose not to engage in them.

¶ 39                    d. Christina White

¶ 40     The State called Christina White, who testified that she was employed by DCFS and was the caseworker on respondent's case from September 2023 to December 2023.

¶ 41     When White took over the case, "there were no services [required of respondent] because the goals had already changed [(to substitute care pending determination on termination of parental rights)]," but White "did offer her parenting [classes] again" because respondent had another child who had come into care. White testified that she discussed with respondent "[w]hat the services were that she was supposed to be doing, over and over." White was never close to returning G.B. to respondent during her time on the case.

¶ 42     During White's time as respondent's caseworker, respondent did not have a visitation schedule. White explained, "There was a visitation [schedule], but then it changed to there were no visits and she should stop and then there was a critical decision made because she wanted to start up visits when I became the case worker." White stated that the "critical decision" that was made was not to resume visitation because "[i]t had been over a year or so since [respondent] had contact with [G.B.] and it would not be in his best interest."

¶ 43                              e. Jewel Waddy

¶ 44     Jewel Waddy testified that she was employed by DCFS and was the current caseworker, having taken the case over from White in December 2023. During Waddy's time on the case, she had contact with respondent, but no visitation between respondent and G.B. occurred. Respondent was not required to do any services because the goal had been changed to substitute care pending a determination on termination of parental rights. Waddy testified that there was no time since she has been on the case that she was close to returning G.B. to respondent's care.

¶ 45     Waddy further testified that she was working with respondent regarding her other

child that had come into care, but services were not directed toward G.B. because of the change in goal. When respondent communicated with Waddy, respondent asked about her other child in care but did not ask about G.B. Respondent was engaged in parenting and counseling services but had not successfully completed them.

¶ 46                                          f. Valerie B.

¶ 47          Respondent called Valerie B., who was the mother of respondent and grandmother of G.B. Valerie testified that respondent had lived with her for most of respondent's life. She stated that there was a period of time in the beginning of the case during which "we did not want [DCFS employees] in [the house] because we were trying to work on the inside of the house." Valerie stated, however, that respondent "told them later that they were welcome to come, if I remember correctly." She testified that, although there were "some things that we needed to touch up to get dealt with on the inside of the house," she believed the home was an "adequate" environment for G.B.

¶ 48          Regarding visitation with G.B., Valerie testified that respondent "was visiting with [G.B.] all she could, I believe." She explained that respondent "was sick a couple of times or whatever." She testified that she "believe[d] [respondent] was doing everything she could as a mother and a human being would do for their child."

¶ 49          On cross-examination by the State, Valerie testified that respondent had never lived on her own or held a steady job. The prosecutor asked Valerie if she would "agree that [respondent] relies on others for money, for her housing, for her care," and she answered, "Well, I mean, at this time until she gets her own income, she really just doesn't have a choice." Valerie explained that respondent had applied for disability.

¶ 50          On cross-examination by the guardian *ad litem* (GAL), when asked if her

daughter had an intellectual disability, Valerie answered, "I don't know what that is." The GAL then asked if respondent could function on her own, and Valerie answered that respondent was physically and mentally capable of raising a child and she believed respondent could care for G.B. without her support.

¶ 51    The trial court asked Valerie what disability respondent had that would entitle her to disability income, and she said she was "not completely sure."

¶ 52                                g. Respondent

¶ 53    Respondent testified on her own behalf. She stated that she completed parenting classes at Mini O'Beirne Crisis Nursery "yesterday" and the trial court admitted into evidence, at her attorney's request, a certificate of completion (which was dated February 28, 2024—the day before respondent testified). Respondent stated that she learned "[s]tuff like morals, stuff like discipline, *** how to love a child, pretty much how to raise [a child]." She also testified that, prior to that class, she completed a 16-week class at The Parent Place through Zoom.

¶ 54    Respondent testified that she does not use drugs or alcohol. She was asked to do drug tests and she "did five or six of them." She stated that she missed three of them due to not having transportation and another because the caseworker notified her "at the last minute" before the testing facility was closing.

¶ 55    Respondent also testified that she attended a psychological assessment and attended mental health counseling. She stated, "I did do, I think, mental health sessions briefly with counselors over the phone through, like, Memorial Behavioral Health and Central Counties [Health Centers (Central Counties)] and for once or twice at Springfield Clinic." Respondent's attorney handed her an exhibit she identified as a letter from Central Counties dated October 16, 2023, stating that respondent had engaged in counseling services. Respondent stated she started

those services on October 16, 2023, and was attending one session a month by phone. She stated that she started these services "around the time" her other child was taken into care.

¶ 56    Respondent said that before Central Counties, she attended counseling at Memorial Behavior Health. She then explained, "[S]ome of the reasons I didn't attend sessions was because I didn't have a car, DCFS was messing around with me with bus tokens," and, although she had a phone, she did not have access to the Internet, so "it was kind of hard to get phone services *** for my counseling appointments." She also did one or two mental health counseling sessions at Springfield Clinic in February 2022.

¶ 57    Respondent testified that, since G.B. was born, she lived with her mother and was never employed. She was in the process of "trying to get [Supplemental Security Income]" for a "[gastrointestinal] problem with my bowels where my bowels don't want to move forward and whatnot."

¶ 58    Respondent also testified that she cooperated with DCFS and explained that there were times she did not let them into the house because "they lied and said my mom's house ha[d] bed bugs." Respondent continued, "We have had a bug problem, but DCFS did not give any help." She also explained that her mother was trying to remodel the house.

¶ 59    Respondent's attorney asked her whether she attended her visits with G.B., and respondent answered as follows:

> "My visits with [G.B.], I didn't go to. I went to, like, a lot of them. Just didn't go to all of them. And I didn't go to all of them, like I said. One, I had no help with the father. Two, it was also hurting me to be ripped from my son from—going for two hours and I just felt like it was causing me and my child trauma. Three, there were times I was contagious and I didn't want to pass

anything [to] my son to get him sick."

¶ 60        On cross-examination by the State, respondent testified that (1) although she completed the classes at The Parent Place, she failed the test and did not receive a certificate of completion and (2) she started the parenting classes at Mini O'Beirne Crisis Nursery in October 2023 after her other child was born and taken into care by DCFS. She also testified that she was employed for a week at a video poker establishment and received financial support and housing from other people.

¶ 61        On cross-examination by the GAL, respondent testified that "DCFS lies a lot," particularly about her house being unlivable. The GAL asked her how many visits she attended in 2022, and she answered, "[A]ltogether I know I had 11, but I'm not sure if that was in 2022 or 2021." She did not attend any visits in 2023 because DCFS suspended visitation. She acknowledged that she last visited with G.B. "somewhere in the year of 2022."

¶ 62                      h. The Trial Court's Findings

¶ 63        The trial court found that the State had proved by clear and convincing evidence each of the allegations in the supplemental motion for termination of parental rights. Specifically, the court found that, although it appeared that "since October of last year, [respondent] may have started to work toward some of the things that were requested of [her] back in early 2021," the evidence of her noncompliance with services was "overwhelming." The court explained as follows:

> "You didn't cooperate with DCFS. You did not cooperate with habilitation
> services. You had little to no visits with your son. When you did visit with him,
> the evidence was that you sat in the chair and the child was on a blanket on the
> floor. You didn't engage with him. You did not complete your mental health

services. You missed at least three toxicology tests.

Additionally, you did not have an income or a stable place to live. You have not demonstrated an ability to adequately care for your son, [G.B.]

Moreover, Dr. Judy Osgood provided us with a psychological assessment that says that you do not have the ability to parent your child. Moreover, she said you do not have the ability to function on your own.

Additionally, there's no evidence of completion of any services. There are at least seven service plans and all of them are unsatisfactory.

So for all the time periods listed, I am finding that the State has met its burden by clear and convincing evidence regarding each and every paragraph in the petition, including regarding the reasonable efforts and reasonable progress.

\*\*\*

\*\*\* [Respondent] has not engaged in services. She doesn't follow through. There's no reasonable progress. And she—most importantly, this child is three years old and she doesn't visit with her son."

¶ 64                                      2. *The Best-Interest Proceedings*

¶ 65        In May 2024, the trial court conducted the best-interest portion of the termination proceedings. At the State's request, the court took judicial notice of "the unfitness findings, the orders and the hearing[s] that were held [in January and February 2024]."

¶ 66                                      a. Jewel Waddy

¶ 67        The State again called Waddy, who testified that she was G.B.'s caseworker until March 2024, when she handed that responsibility to Jennifer Power. Waddy testified that G.B. had just turned three years old and was living with foster parents "Mike and Molly," who

specialized in behavioral issues. She stated that G.B. was initially placed with Mike and Molly for six months, then went to live with a great-aunt for approximately nine months, then returned to Mike and Molly, who were his current foster parents. Waddy testified that the great-aunt "ended up moving" and could not care for G.B. any longer.

¶ 68 Waddy testified that in his current foster home, G.B. had "made a lot of progress behaviorally" and that his medical, educational, emotional, and social needs were being met. She stated that G.B. was in daycare and participated in occupational therapy. He also had asthma and "has to have a pump when needed." She stated that Mike and Molly "are really good with that."

¶ 69 Waddy testified that G.B. was bonded to his foster parents, calling them "Mommy and Daddy." Mike and Molly wished to adopt G.B. Waddy also testified that she observed G.B.'s bond with Mike and Molly, as well as the other individuals living in the foster home, which included two older children and Molly's mother. G.B. had not seen his biological mother in well over a year.

¶ 70 On cross-examination by respondent's attorney, Waddy testified that the other two children in the home were the foster parents' biological children. Molly's mother was "very active," and G.B. called her "Gammy." She stated that G.B. "always wants to be around her" and went to her when Waddy visited the home. She also testified that the foster parents "expressed that they wouldn't mind keeping in touch and letting [respondent] see [G.B.]"

¶ 71                                    b. Jennifer Power

¶ 72 Jennifer Power testified that she was the caseworker for G.B. from mid-March 2024 to the present. She visited the foster home twice a month since receiving the case. G.B. was receiving speech therapy, occupational therapy, and behavioral therapy. She had also referred him for early intervention rehabilitation services. Power testified that G.B. was well cared for

and happy in his foster home. His foster parents used appropriate discipline, such as timeouts and redirecting him. Powers stated that "there's definitely a bond there."

¶ 73    She also testified that G.B. reached out for his foster parents when he wanted comfort and called them "mom and dad." She believed that G.B. was progressing in his foster home, which was an adoptive placement.

¶ 74    On cross-examination by respondent's attorney, Power stated that she had never met or spoken with respondent. Power explained that she was responsible for adoptions and received the case after respondent was found unfit.

¶ 75                          c. Valerie B.

¶ 76    Respondent called Valerie B., who testified that respondent was a "wonderful mother," who "loved both of her children dearly" and "crie[d] every day without her kids." She stated that when G.B. lived in her home prior to being taken into custody, respondent changed G.B.'s diapers. She described one day when she left G.B. with respondent and her boyfriend. Valerie stated she "was actually very amazed when I came home, and they had a new diaper on him. They had a new outfit on him, and they were feeding him."

¶ 77    Valerie believed it was in G.B.'s best interest to live with respondent, who would be living in Valerie's home, along with respondent's boyfriend. She stated that respondent was unemployed and would be able to care for G.B. all day.

¶ 78                          d. Respondent

¶ 79    Respondent testified that she currently lived at her mother's house with her boyfriend and her mother's boyfriend. Respondent's attorney asked the reason why G.B. was taken away from her, and respondent answered, "I found out that it had been neglect, that the allegation was neglect." Her attorney asked, "Okay, so do you know in what way you were being

alleged to have neglect[ed] him?" Respondent answered, "Not fully, no."

¶ 80       Respondent testified that, if G.B. came to live with her, he would have his own room, and she would get him to his medical and therapy appointments. She acknowledged that neither she nor her mother drive and have had transportation problems in the past, but they take cabs and buses. She said, "There should be no issue with not getting him to his appointments."

¶ 81       Respondent's attorney asked what specific reasons she had to believe that she was the best person for G.B. to live with, and respondent answered as follows:

> "I am his mother, you know, just knowing that I am his God-given blood mother, and I was innocent in all of this. It really just eats me alive, and I love my child to death. I would never harm my kids. DCFS put down I'm a danger around children. I've never harmed anyone else's children or my own children. I know that it's in the best interest as his mother that his mother helps him to everything that are his needs, things that can help him grow and become a successful adult."

¶ 82       On cross-examination by the GAL, respondent testified that she had 10 or 15 visits with her son before they were stopped. The GAL asked, "Okay, there are many months, though, without visits with your son, right?" Respondent answered affirmatively but explained, "They messed around with me with transportation periodically in the beginning, and then they finally didn't give me bus tokens until February of 2022." The GAL asked whether her failure to see her son for many months was "all based on transportation issues," and respondent answered, "Yes."

¶ 83                          e. The Trial Court's Findings

¶ 84       The trial court found that it was in G.B.'s best interest to terminate respondent's parental rights. When ruling, the court first noted that G.B. had been taken into care when he was

- 18 -

five weeks old and was now three years old. The court then stated as follows:

"[G.B.] has special needs, and based on the testimony here today, all of his needs are currently being met by the foster parents. I heard that he is thriving in this situation.

The main issue for me is progress. I look at the period of time this case has gone on, and *** this is a three-year-old case this month.

I look at the best interest factors in the statute, and I am to consider the safety and welfare of the child, the development of his identity, his background ties, his sense of attachments. I look at the person he looks to day in and day out for his care. Who is the one who puts him to bed. Who is the one that gets him up in the morning. Who bathes him. Who clothes him. Who feeds him. Who takes him to occupational speech therapy. Who takes care of him when he is sick. In answer to that, it's not [respondent]. The answer to that [is] the foster parents.

I am to look at the child's sense of security and sense of familiarity, the continuity of affection for the child. What is the least disruptive placement alternative. The child is not old enough to have long-term wishes. His community ties have all been with someone else.

I look for the need for permanence and the risks attendant to being in substitute care. The fact of the matter is that this is a three-year old child who has spent his entire life in a foster home. What I have to look at is what is in the best interest of [G.B.] I believe that [G.B.] should no longer have to linger in foster care any longer.

At this time, given all the best interest factors and clearly by a

preponderance of the evidence, I do find that it is in the best interest of [G.B.] that the parental rights of [respondent] be terminated."

¶ 85        This appeal followed.

¶ 86                              II. ANALYSIS

¶ 87        Respondent appeals, arguing that the trial court's (1) fitness and (2) best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 88                          A. Respondent's Brief

¶ 89        As an initial matter, we note that the State has argued that respondent, who is represented by counsel, has forfeited her arguments on appeal because she has failed to (1) cite the trial court's findings, (2) cite relevant authority as to each of the court's findings of unfitness, and (3) provide an analysis of the issues raised, all in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 90        Rule 341(h)(7) requires that an appellant's brief *shall contain* an argument section, "which *shall contain* the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." (Emphasis added.) *Id.*

¶ 91        We agree with the State that appellant's brief is deficient in the manners alleged and violates the mandates of Rule 341(h)(7). Nonetheless, we are able to ascertain respondent's contentions on appeal and choose to address them on their merits.

¶ 92        However, we caution respondent's counsel that any future violation of Rule 341 could result in his brief being stricken.

¶ 93                      B. The Fitness Determination

¶ 94        Respondent argues the trial court's finding that she was unfit was against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of

- 20 -

unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's findings that respondent failed to make reasonable progress within the nine-month periods of (1) January 2022 to October 2022 and (2) October 2022 to July 2023 were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 95                      1. *The Applicable Law and Standard of Review*

¶ 96          The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2018). Reasonable progress is an objective view of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51, 187 N.E.3d 763. Additionally, the Illinois Supreme Court has held, "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans." *In re C.N.*, 196 Ill. 2d 181, 216, 752 N.E.2d 1030, 1050 (2001). Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

¶ 97          A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. Accordingly, a trial court's finding of parental unfitness will not be reversed

unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 98                                                    2. *This Case*

¶ 99          The evidence in this case amply supports the trial court's finding that respondent failed to make reasonable progress toward the return of G.B. during either of the nine-month periods alleged in the motion for termination of parental rights. Vorreyer was the caseworker for nearly the entirety of those periods, and she testified that (1) none of the service plans were rated satisfactory, (2) respondent did not successfully complete any of the services required of her, (3) respondent was offered 2 visits a week and attended only 11, and (4) at no time was Vorreyer close to returning G.B. to respondent's care.

¶ 100          Vorreyer's assessment of respondent's lack of progress toward G.B.'s return was supported by Osgood's opinion that respondent was "unable to discharge minimal parenting standards" and "would not benefit from additional services."

¶ 101          Although respondent maintained contact with DCFS and attended some services, she made no objective, measurable progress toward G.B.'s return to her care. The parenting coach reported that respondent could not perform necessary skills, such as preparing a bottle or changing a diaper. The mental health counselor reported that respondent spent more time in sessions focused on blaming DCFS for her situation than addressing her own issues. During her own testimony, respondent blamed her failure to complete services on a lack of transportation, despite evidence that DCFS provided transportation for her. Respondent also demonstrated a lack of understanding as to why G.B. was even taken into care in the first place.

¶ 102          Most critically, respondent failed to perform even the most fundamental of tasks,

such as (1) developing a bond with her child by spending time with him at visits or (2) allowing DCFS into her home to determine whether it was a safe environment for G.B.

¶ 103    For these reasons, we agree with Vorreyer's assessment that respondent made no progress towards returning G.B. to her care.

¶ 104                    C. The Best-Interest Determination

¶ 105                    1. *The Applicable Law and Standard of Review*

¶ 106    At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See 705 ILCS 405/1-3(4.05) (West 2022).

¶ 107    A reviewing court affords great deference to a trial court's best-interest finding

because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 108                                    2. *This Case*

¶ 109          The evidence in this case also amply supports the trial court's finding that it was in G.B.'s best interest to terminate respondent's parental rights.

¶ 110          G.B. was taken into care as a newborn and spent the majority of his life in the home of his foster family. G.B. has bonded with his foster parents, foster siblings, and foster grandmother. In addition, G.B.'s foster parents have (1) provided a loving, stable home, where all of G.B.'s social, educational, and developmental needs are met and (2) committed to adopting G.B.

¶ 111          In contrast, G.B. has never lived with or bonded with respondent, who attended supervised visits with G.B. only 11 times in his three years of life. Respondent has demonstrated an inability to meet minimal parenting skills, let alone G.B.'s special medical and therapeutic needs.

¶ 112          Accordingly, we conclude the trial court's finding that termination was in G.B.'s best interest was well supported by the record.

¶ 113                                    III. CONCLUSION

¶ 114          For the reasons stated, we affirm the trial court's judgment.

¶ 115          Affirmed.